JUN 18 2004 2:48PM KOCH ENTERTAINMENT 2    Filed 07/12/2007   Page 1 of 25   P.5
0-10-JVP ST.JOHN,BURGEE ASHAROFF  Document 2          :1818 264 7578    # 4/ 11

Jun 11 04 03:50p                                                      p.8

## RIGHTS PURCHASE AGREEMENT
### (Principal Agreement)

THIS RIGHTS PURCHASE AGREEMENT ("Agreement") is entered into as of this 1st day of January, 2000 by and between DEATH ROW RECORDS, LLC ("Owner") and DIMPLES MERCHANDISING, INC., a California corporation ("Purchaser").

1.    DEFINITIONS

a.    "Record(s) shall mean any reproduction of a master recording in any form now known or later developed in which sounds are fixed by any method now known or later developed, and from which sounds, without visual images, can be perceived, reproduced or otherwise communicated, and shall include the object in which sounds are so fixed.

b.    "Masters" shall mean the sound recordings of individual musical compositions which are embodied on all phonograph record albums which are now owned or controlled by Owner, its owners, affiliates or subsidiaries, as well as any future phonograph record albums or other recordings which Owner may create, purchase or otherwise acquire at any time in the future.   Owner agrees to provide a listing of all such Master upon written request by Purchaser.

c.    "Purchase Price" shall mean the amount payable by Purchaser to Owner for the sale of certain use rights to such Masters, as is more fully described in Section 2 hereof, for the manufacture, advertising, marketing, promotion, distribution and sale of Records hereunder and shall be deemed to include, without limitation, any royalty or other payment payable by Owner, within in lieu or royalties or otherwise, due artists, producers, persons, firms, or corporations or any third party whatsoever, which own or control the right to manufacture or cause the manufacture, marketing, promotion, advertising, distribution, and sale of Records manufactured hereunder, or who otherwise have a right to royalties or other payments on account thereof, but shall exclude any payments that may be due to copyright proprietors of the musical selections embodied on the Masters, and any payments to the Musical Performance Trust Fund and the Administrator of the Special Payment Fund of the American Federation of Musicians, and to any similar fund established by a collective bargaining agreement pertaining to the recording industry, which subject to paragraph 8.a.(9) hereof shall be the responsibility of Purchaser. Purchaser shall be solely responsible for paying any so-called use or re-use fees or similar fees required to be paid, if any, in connection with Purchaser's exploitation of the Masters.

d.    "Territory" shall mean the universe.

2.    SALE OF RIGHTS.

In consideration of the payment of the Purchase Price, Owner hereby sells, grants and conveys to Purchaser exclusively and forever, the right ("Rights") to manufacture, advertise, market, promote, distribute and sell Records through any and all systems ("Systems") of "custom digital music services," directly or through licensees or agents, embodying the Masters, along

1

Exhibit A

with or without sound recordings from other sources, in the Territory. Owner hereby also grants to Purchaser the non-exclusive right to broadcast and/or publicly perform the Masters in the Territory. For purposes hereof, "custom digital music services" shall mean any and all services allowing a consumer to order, acquire or otherwise obtain customized Records and digital downloads of the Masters through stand alone kiosks, direct mail, or via the Internet and receive delivery of such customized Records or digital downloads via any delivery system, including without limitation satellite, cable, or other digital or electronic distribution or similar transmission whether now know or hereafter discovered. Purchaser shall not have the right to edit or alter any of the Masters without the prior written consent of Owner.

3.    ARTWORK LICENSE.

To the extent that Owner has or controls such rights, Owner grants to Purchaser the non-exclusive right to use, in connection with the Masters, the same graphic components used by Owner in its distributor of Records embodying the Masters. Owner shall make available film, digital imagery, or other delivery of such graphic components under Owner's control or in Owner's possession for manufacture, printing, and production by Purchaser. Purchaser shall cause a legend to be placed on any use of the graphic components indicating that the item to which it refers has been offered under license from Owner to Purchaser.

4.    PURCHASE PRICE.

As full consideration for the rights herein granted by Owner to Purchaser and for all of the covenants, representations and warranties of Owner herein set forth, Purchaser agrees to pay Owner, and Owner agrees to accept, the total sum of ███████████████ ████████ (the "Purchase Price") payable within twelve (12) months from the date hereof. Purchaser shall pay the Purchase Price to Owner or directly to Owner's designees, as Owner may, from time to time, instruct Purchaser. The payment of the Purchase Price shall be made in such sums as Owner shall request as and when Purchaser notifies Owner that Purchaser is prepared to make such payments. In any event, Purchaser shall not be required to pay any payments requested by Owner once the total payments paid to Owner or its designees totals the full Purchase Price.

5.    ADVERTISING AND PROMOTIONAL MATERIAL

Owner hereby grants to Purchaser the right to use, in connection with the advertising, marketing, promotion, distribution and sale of Records and the Systems, Owner's trademarks and trade names in the approved form and style to be furnished by Owner, and the names (legal and professional), approved likenesses, and approved biographical material of all artists and other individuals and entities who performed services in connection with the Masters. Owner agrees to notify Purchaser in writing of any changes in its approved trademarks or trade names, and of any and all contractual restrictions regarding the use of the names (legal and professional) and likenesses of any artist whose performances are embodied in the Masters. Any advertising or publicity referring to such artists shall be limited to and may only indicate that such artists performed services in connection with the Masters and shall not indicate in any way

JUN 18 2004 2:49PM    KOCH ENTERTAINMENT    Filed 07/12/2007   Page 3 of 25    P.7
Case 1:04-cv-02845-RJH    Document 51-2                      1 1 618 284 7678      # 8/ 11

Jun 11 04 03:52p                                                            p.10

that such artists endorse, are connected or associated with the advertising, promotion or distribution of the Records through the Systems.

### 6. NO OBLIGATION TO USE RIGHTS.

Nothing herein contained shall be construed to obligate Purchaser to make use of the rights acquired hereunder, provided that Purchaser's failure to make use of the rights shall not relieve Purchaser from its obligation to pay Owner the Purchase Price as set forth herein.

### 7. RIGHTS GRANTED

Purchaser shall enjoy, solely and exclusively, all of the rights, licenses, privileges and property granted hereunder throughout the universe, in perpetuity, as long as any rights in the Property are recognized in law or equity, except insofar as such period or perpetuity may be shortened due to any now existing or any future copyright by Owner of the Property and/or any adaptations thereof, in which case Purchaser shall enjoy its sole and exclusive rights, licenses and privileges and property hereunder to the fullest extent permissible under and for the full duration of such copyright or copyrights, whether common law or statutory, and any and all renewals and/or extensions thereof, if any, and shall thereafter enjoy all of said rights, licenses, privileges and property non-exclusively in perpetuity throughout the world. All the rights, licenses, privileges and property herein granted to Purchaser are irrevocable and not subject to rescission, restraint, or injunction under any and all circumstances; and no rights herein shall remain in or revert to Owner for any reason whatsoever

### 8.    REPRESENTATIONS AND WARRANTIES.

a. Owner hereby represents and warrants that:

(1) Owner the sole owner of the Rights and Owner has the full right, power and authority to enter into this Agreement and to grant to Producer all of the Rights herein provided for.

(2) Owner has complied and will continue to comply with the requirements of all unions having jurisdiction over the production of the Masters. Owner will not grant to any third party any rights that would in any way derogate from or be inconsistent with the rights granted to Purchaser hereunder.

(3) Owner has made or will make when due all payments due any party in respect of Purchaser's exploitation of the Masters under this Agreement, except those which are the responsibility of Purchaser hereunder.

(4) The full use of the Masters, or any of them, as herein granted, will not, to the best of Owner's knowledge, in any way violate or infringe upon any copyright (common law or statutory) belonging to any person or infringe upon any personal, proprietary or other rights of any person or entity; and in particular, without limiting the generality of the foregoing, and to the best of Owner's knowledge, the use of the Masters or the exercise of any of the rights granted herein will not constitute a libel or defamation of, or an invasion of, the rights of privacy of, or

the right to be free from unfair competition, or otherwise violate or infringe upon any other right or rights whatsoever of any person.

(5) There are no rights, licenses and/or grants of any kind in favor of any person, firm or corporation and no claims, litigation or other proceedings pending or threatened, which could or purport to in any way impair, limit, diminish or infringe upon the rights herein granted Purchaser.

(6) The Masters are or may be validly copyrighted in the United States and likewise protected elsewhere so far as the laws of other countries provide for protection because of copyright subsisting in the United States. Owner has not done and will not hereafter do, or authorize, or permit to be done, any act of commission or omission which would permit the Masters to be or become in the public domain anywhere throughout the world. Owner has merchantable title to all rights in and to the Masters.

(7) Owner will not at any time hereafter execute any other agreement in conflict herewith or in any way attempt to sell, dispose of, encumber or hypothecate any of the rights herein granted to Purchaser with respect to the Masters or do or knowingly permit to be done any act or thing by which said rights may be impaired; and Owner will not use or permit the use of any of the rights in the Masters not granted to Purchaser in any manner or for any purpose which would unfairly compete with or impair the value of the full and unrestricted use of the rights herein granted to Purchaser; and Owner agrees to specifically mention and reserve the rights herein granted when any grant is made to others of any right or interest in the Masters.

(8) All necessary master use licenses with respect to the samples embodied in the Masters have been obtained by Owner.

(9) Purchaser will not be required to pay mechanical copyright royalties with respect to exploitations of a Master in the United States in an amount grteater than the then current statutory rate for a single musical composition (i.e. as of the date hereof, the greater of .0755 per Master or .0145 per minute or fraction thereof).

9.    OWNER'S SUBMISSIONS: COPYRIGHT INFORMATION
      a.   Owner shall promptly cause to be submitted to Purchaser the following material related to all Masters:

(1) A listing notice setting forth the following: (a) the titles of the Masters; (b) the complete label copy, including all trademarks, title and subtitle of such musical compositions, the names of all artists, producers, composers, lyricists, publishers, and copyright proprietors thereof, and the applicable public performance rights society; (c) if known, the year and country of each recording session at which any part of the Masters was recorded, together with all information needed to determine payments due; (d) a listing and detailed description of any restrictions or requirements imposed upon Owner in connection therewith. Owner hereby notifies Purchaser that Purchaser may not use the phrase "2Pack's Greatest Hits" in connection with the advertising or sale of the Masers embodied on such album as Owner's right to utilize such phrase is limited to sales through normal retail channels.

4

warranty herein set forth), to institute in the name and on behalf of Owner, or Owner and Purchaser jointly, any and all suits and proceedings in law or in equity, to enjoin and restrain any infringements of the rights herein granted, and hereby assigns and sets over to Purchaser any and all causes of action arising or resulting by reason of or based upon any such infringement, and hereby assigns and sets over to Purchaser any and all recoveries obtained in any such action. Owner will not compromise, settle or in any manner interfere with such litigation if brought. Owner will and does hereby appoint Purchaser his irrevocable attorney-in-fact to establish and protect the validity of all rights herein granted if they are attacked or appropriated by others, and Purchaser may also sue or defend in the name of Owner and/or Purchaser and/or the copyright proprietor of the Masters.

13.     ADDITIONAL DOCUMENTS.

Owner will duly execute, acknowledge and deliver to Purchaser, or cause to be executed, acknowledged and delivered to Purchaser, in form approved by Purchaser, any and all further assignments or instruments, consistent herewith, which Purchaser may deem necessary, expedient or proper to evidence the transfer of the rights by Owner to Purchaser, or to protect, enforce, defend or confirm any of Purchaser's rights hereunder, or otherwise to carry out and effectuate the purposes and intent of this Agreement, including but not limited to:

a. In the event of the renewal or extension of the copyright in or to the Masters, such assignments or other instruments as may be required by Purchaser to effectively vest in Purchaser, throughout the full period of such renewal of copyright, all of the rights, licenses, privileges and Masters herein granted to Purchaser; and

b. Other originals of this Agreement, and to procure for Purchaser signed documents and other proof satisfactory to Purchaser's counsel, if such is reasonably required to establish a clear chain of title in the Purchaser to the rights herein granted.

c. If Owner shall fail to do or cause to be done any act or thing necessary to obtain a renewal of the copyright in the Masters, or if Owner shall fail to execute and deliver to Purchaser assignments or instruments required of Owner under the provisions of this Agreement, then to the extent that Owner shall legally be entitled to renew or require the renewal of such copyright, or to execute, acknowledge and deliver such assignments or other instruments, Owner hereby appoints Purchaser his irrevocable attorney-in-fact, with the right, but not the obligation, to do any and all acts and things necessary to obtain such renewal of copyright and to execute, acknowledge and deliver any and all such further assignments and other instruments, in the name of and on behalf of Owner, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable.

d. Owner specifically agrees that the foregoing provisions pertaining to the rights in the Masters, specifically including but not limited to renewals of copyright in the Masters, shall be binding upon Owner, Owner's successors and assigns forever.

## 14. ASSIGNMENT OF AGREEMENT

Purchaser may assign and transfer this Agreement or all or any part of its rights hereunder to any person, firm or corporation without limitation; and this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives and assigns, forever.

## 15. MISCELLANEOUS

a. The parties hereto intend this Agreement, together with any related documents referred to in this Agreement, to constitute the entire understanding and agreement of the parties with respect to the subject matter of this Agreement, and any and all prior agreements, understandings or representations are hereby and intended to be terminated and canceled in their entirety.

b. This Agreement shall, in all respects, be governed by the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail but the provision of this document which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

c. The captions appearing at the commencement of the paragraphs hereof are descriptive only and are for convenience and reference and shall not be construed as part of this Agreement. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this document.

d. The parties hereto represent and warrant that they have had the opportunity to be represented by independent counsel in the negotiation and consummation of this Agreement and the transactions contemplated hereby or have voluntarily waived or exercised their right to have discussed and reviewed this Assignment with and be advised by such counsel. The parties further agree to pay their respective costs and expenses of legal counsel or other professional advisors retained by them with respect to the foregoing.

e. The parties hereto intend this Agreement, together with any related documents referred to in this Agreement, to constitute the entire understanding and agreement of the parties with respect to the subject matter of this Agreement, and any and all prior agreements, understandings or representations are hereby and intended to be terminated and canceled in their entirety

JUN 18 2004 2:51PM   KOCH ENTERTAINMENT   Filed 07/12/2007   Page 7 of 25   p. 11
6-16-04; 6:06PM;BURGEE ABRAMOFF                                   ;1818 284 7578        # 11/ 11

Jun 11 04 04:12p                                                                        p. 1

f.      No amendment, change or modification of this Agreement shall be valid unless in writing and signed by all of the parties in interest at the time of such amendment, change or modification.

g.      The words "Owner" and "Purchaser" as used herein shall refer to the parties designated in this Agreement, and they shall be deemed to mean and include such party and such party's heirs, administrators, executors, successors, licensees and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above mentioned.

"OWNER"                              "PURCHASER"
DEATH ROW RECORDS, LLC               DIMPLES MERCHANDISING, INC.


By _____             By _____
__S__—Suge Knight                       Tammie Hawkins

8

| NUMBER | DESCRIPTION | Filing Designation |
|--------|-------------|--------------------|
| | Mortgage of Copyright | Vol. 3429 Page 272 |
| | Confirmation of Exclusive Rights | Vol. 3548 Doc. 530 |
| DRR-CD-2018 | TOO GANGSTA FOR RADIO (EX) | SR-306-308 |
| DRR-CD-2019 | TOO GANGSTA FOR RADIO (CL) | SR-306-308 |
| DRR-CD-63002 | SNOOP DOGGY DOGG:DOGGYSTYL(EX) | SR-212-342 |
| DRR-CD-63003 | SNOOP DOGGY DOGG:DOGGYSTYL(CL) | SR-306-206 |
| DRR-CD-63004 | ABOVE THE RIM | SR-187-709 |
| DRR-CD-63005 | MURDER WAS THE CASE (EX) | SR-208-107 |
| DRR-CD-63007 | THA DOGG POUND:DOGG FOOD | SR-225-782 |
| DRR-CD-63008 | 2PAC:ALL EYEZ ON ME (EX) | SR-331-786 |
| DRR-CD-63009 | 2PAC:ALL EYEZ ON ME (CL) | SR-331-786 |
| DRR-CD-63010 | SNOOP DOGGY DOGG:THA DOGGF(EX) | SR-230-624 |
| DRR-CD-63012 | MAKAVELI:THE 7 DAY THEORY (EX) | SR-396-405 |
| DRR-CD-63013 | MAKAVELI:THE 7 DAY THEORY (CL) | SR-396-405 |
| DRR-CD-63014 | DEATH ROW GREATEST HITS (EX) | SR-233-893 |
| DRR-CD-63016 | CHRISTMAS ON DEATH ROW | SR-230-491 |
| DRR-CD-63017 | GRIDLOCK'D | SR-233-365 |
| DRR-CD-63019 | GANG RELATED | SR-331-781 |
| DRR-CD-63020 | "DAZ DILLINGER:RETALIATION, REV" | SR-331-776 |
| DRR-CD-63021 | MICHEL'LE:HUNG JURY | SR-221-763 |
| DRR-CD-63022 | CHRONIC 2000 | SR-331-779 |
| DRR-CD-63053 | DYSFUNKTIONAL FAMILY SOUND(EX) | SR-397-683 |
| DRR-CD-63054 | DYSFUNKTIONAL FAMILY SOUND(CL) | SR-397-683 |
| DRR-CD-63058 | KURUPT:AGAINST THE GRAIN (EX) | SR-397-679 |
| DRR-CD-63059 | KURUPT:AGAINST THE GRAIN (CL) | SR-397-679 |
| DRR-CD-63060 | VERY BEST OF DEATH ROW:VAR(EX) | SR-397-312 |
| DRR-CD-63061 | VERY BEST OF DEATH ROW:VAR(CL) | SR-397-312 |
| DRR-CD-63065 | SNOOP DOGGY DOGG:MURDER WAS TH | SR-208-107 |
| DRR-CD-63066 | DR.DRE:THE CHRONIC (TARGET) | SR-331-779 |
| DRR-CD-63067 | SNOOP DOGGY DOGG:THA DOGGFATHE | SR-230-624 |
| DRR-CD-63071 | DR.DRE:DEATH ROW'S GREATES(EX) | SR-233-893 |
| DRR-CD-63072 | DR.DRE:DEATH ROW'S GREATES(CL) | SR-233-893 |
| KOC-CD-5746 | 2PAC:LIVE (EX) | SR-397-813 |
| KOC-CD-5747 | 2PAC:LIVE (CL) | SR-397-813 |
| KOC-CD-5800 | 2PAC:ALL EYEZ ON ME (EX) | SR-331-786 |
| KOC-CD-5805 | 2PAC:ALL EYEZ ON ME (CL) | SR-331-786 |
| KOC-CD-5810 | MAKAVELI:THE 7 DAY THEORY (EX) | SR-396-405 |
| KOC-CD-5811 | MAKAVELI:THE 7 DAY THEORY (CL) | SR-396-405 |
| KOC-CD-9530 | 2PAC:NU-MIXX KLAZZICS (EX) | SR-397-684 |
| KOC-CD-9531 | 2PAC:NU-MIXX KLAZZICS (CL) | SR-397-684 |

Exhibit B

# KOCH ENTERTAINMENT
## LABEL ALLIANCE

KOCH ENTERTAINMENT LLC, 2 TRI-HARBOR COURT, PORT WASHINGTON, NY 11050
TEL: 212-353-8800 FAX 212-228-8886

November 28, 2001

Mr. Suge Knight
Death Row Recordings, LLC a/k/a
"Death Row Records" or "Tha Row Records"
8200 Wilshire Blvd.
Beverly Hills, CA 90211

Dear Suge:

This confirms that Death Row Recordings, LLC a/k/a "Death Row Records" or "Tha Row Records" (collectively "Death Row", "you" or "your") hereby exclusively license to us, the master recordings (the "Masters") embodied in the albums set forth below. The following are the terms and conditions of this agreement:

    1.    <u>PRODUCT</u> - The following albums are hereby exclusively licensed to us under the terms and conditions of this agreement:

    (a) <u>Initial Albums</u>:

        (i)    Death Row back catalogue, as set forth on Schedule "A" hereof and any other album in your catalog that reverts to you during the Term (the "Catalog"); and (ii) A new unreleased studio album by the artist, p/k/a "Crooked-I" (the "New Album") (collectively the Catalog and the New Album may hereafter be referred to as the "Initial Albums").

        (ii)    The Catalog shall be delivered immediately in accordance with paragraph 7 below (including all clearances, mechanical licenses, artwork, label copy, publishing information on disc) (DAT and all artwork on disc).

        (iii)    The New Album shall be delivered in accordance with paragraph 7 below (including all clearances, mechanical licenses, artwork, label copy, publishing information on disc) within 4 months from full signature of this agreement (DAT and all artwork on disc).

        (iv) Additionally, if available, you shall provide us with copies of any marketing material (e.g., "one sheets") available for the Initial Albums and or relating to the respective artists performing on those albums.

    (b) Collectively the Initial Albums may hereafter be referred to as the "Albums".

    2.    <u>ADVANCE</u>:

        (a) For the Albums, we shall make available to you, as an advance against your net proceeds, an aggregate of ██████████ (██████████) dollars (the "Advance"). The Advance shall be payable: (i) ██████ (██████████) dollars on November 30, 2001 by wire transfer; (ii) ██████████ (██████████) dollars, by wire transfer, upon satisfaction of your delivery to us of substantially all inventory of any and all Catalog Albums as warehoused and distributed by Valley Media, Inc. d/b/a DNA or in your possession in accordance with subparagraph 2(b) (vi) below; and (iii) ██████████ (██████████) dollars on the Effective Date (as defined in subparagraph 2(b) below) by wire transfer.

k0751034.kt4

1

Exhibit C

(b) The Effective Date of this agreement shall be five (5) business day following satisfaction of each of the following conditions precedent:

(i)  Delivery to us of a fully executed duplicate originals of this agreement executed by you.

(ii) . Our receipt of such financing statements and or copyright mortgages, fully executed by you, as reasonably necessary to evidence and perfect our security interest in the Collateral as defined in paragraph 19 of this agreement. To effectuate the requirements of this subparagraph 2(b)(ii), you agree to: either (i) cause Valley Media, Inc. d/b/a DNA to transfer its UCC-I's and copyright mortgages to us via UCC-II filings or (ii) cause termination of Valley Media, Inc. d/b/a DNA to terminate their UCC-I's by filing UCC-III's and issuing new UCC-I directly in our name in accordance with paragraph 19 below.

(iii) Our receipt, at our manufacturing facilities, of fully usable master recordings and artwork in CDR from for all Initial Albums and all other delivery elements as set for in paragraph 7 below.

(iv) Our receipt of written confirmation from Valley Media, Inc. d/b/a DNA; and copies of the letters issued from Priority and Interscope to Valley Media, Inc. d/b/a DNA, of the Albums that: such distributors have prepared a notification to their customers in writing that the Albums are no longer available through such distributors; such distributors state that they are not then in possession or control of any of the Albums for resale; and, such distributors state that they are not then in possession or control of any of the master recordings and artwork of any of the Albums; true copy of your full release from Valley Media, Inc. d/b/a DNA;

(v)  Our verification, in our sole and absolute reasonable discretion, that all prior liens and encumbrances in and to the Collateral, including specifically but without limitation the security interests of Priority Records, LLC, Interscope Records and Valley Media, Inc. d/b/a DNA, have been either assigned to us or terminated and that we have a perfected first priority interest in the Collateral.

(vi) Receipt of substantially all inventory of any and all Catalog Albums as warehoused and distributed by Valley Media, Inc. d/b/a DNA or in your possession; such inventory shall be delivered to us upon signature of this agreement.

3.    TERRITORY: North America (USA & Canada).

4.    COMMITMENT:  You hereby authorize and appoint us to be your exclusive manufacturer, marketer and distributor of the Albums and any singles (if approved by you) embodied in the Albums during the Term throughout the Territory, and grant and license to us the exclusive right, subject to the terms of this agreement, to manufacture, distribute and sell the Albums and singles (if approved by you), if applicable, as provided by the terms and conditions of this agreement. You shall not yourself or authorize any entity to distribute the Albums or any singles embodied therein, in the Territory during the Term. We shall meaningfully consult with you in good faith in setting the initial wholesale and suggested retail price category of the Albums and any changes therein.

5.    TERM:

(a) The term of this agreement commences upon the Effective Date and shall end December 31, 2004 (the "Term"). Notwithstanding the foregoing, if: (i) we have recouped our Advances to you and your account balance with us is is not negative; or (ii) you pay-off any negative account balance (including but not limited to any unrecouped Advances), either party, upon sending written notice to the other within ninety (90) days of December 31, 2003 (the "Termination Option"). In the event either party terminates the Term in accordance with the Termination Option, such termination shall be subject to the terms and conditions of the sell-off period as set forth below in paragraph 5(b).

(b) At the end of the Term, all rights throughout the Territory granted to us pursuant to this agreement will terminate and will revert to you except that we shall have a six (6) month non-exclusive

k0751034.kt4

2



sell-off period, for all of the records, following expiration of the Term; we may not manufacture or authorize manufacture of records during the sell-off period or excessive amounts in anticipation of the end of the Term (during the last quarter of the Term manufacturing must be approved by you in writing) and no scrapping or price reductions. At the end of the sell-off period, all remaining inventory shall be returned to you along with any parts delivered hereof.

(c)  Notwithstanding anything to the contrary in subparagraph 5(a) above, in the event that upon the expiration of our right to distribute the Album we have not recouped our Advances to you or your account balance with us is negative: (i) the Term shall be extended until 90 days following the accounting period we recoup any outstanding Advances and your account balance with us is greater than zero; or (ii) you, at your sole option, may pay any negative account balance (including but not limited to any unrecouped Advances), and upon full payment, the Term shall end.

6.    RIGHTS:

(a)  Subject to our non-exclusive rights set forth in subparagraph 6(b) below, we shall be the exclusive licensee of your rights in the Masters for the Territory during the Term and exclusive owner of all inventory in the Albums.  The Masters and all reproductions derived therefrom, together with the performances embodied thereon, shall be free from any claims against us by any entity deriving rights or interests from or through you.  Without limiting the generality of the foregoing, we shall have the exclusive right throughout the Territory during the Term hereof:

(i)  To manufacture, advertise, sell lease, license or otherwise use or exploit the Masters and derivatives thereof (including but not limited to phonorecords and any form of digital or electronic transmissions) in any and all media and/or fields of use, whether such derivatives, media and fields of use are now known or hereafter invented;

(ii)  To non-exclusively use and publish and to permit others to use and publish your name and trademark and the Artist's and any guest Artist's names and any guest Artist's names whose performances are embodied in the Masters and to use and publish the Artist's and guest artist's approved photographs, approved likenesses and approved biographical material for advertising and trade purposes (including "stickering" the Album) in connection with the sale and exploitation of records hereunder, and to use your artwork for the Album, free and clear of any claims by any entity.

(iii)  To release Albums under DEATH ROW RECORDS/THA ROW RECORDS imprint, exclusively using our manufacturing codes and UPC number for the sale of the Albums.

(b)  Subject to your approval, we shall be entitled to: (i) non-exclusively license Masters for all ancillary uses, limited to third-party compilations and synchronization licenses ("Ancillary Uses") and (ii) notwithstanding subparagraph 6(a) above our exclusive digital rights in the Masters shall be non-exclusive solely as it pertains to your agreement with Dimples Merchandising, Inc. ("Dimples") for custom compilations and digital downloads; upon expiration of your agreement with Dimples, which you shall not renew, those digital rights become exclusive to us during the Term of this agreement. Notwithstanding anything contained in this agreement to the contrary, you shall have the right to license Masters to third parties for Ancillary Uses; provided that (i) you shall not license more than two (2) such Masters to a third party for inclusion on any one (1) compilation album during the Term and you shall retain 100% of any income you receive for those licenses.

7.    DELIVERY:    You shall deliver to us (i) digital master tapes for the Masters technically satisfactory for the manufacture of records therefrom, (ii) CD or Zip Disks for the packaging artwork (e.g., photoshop, Illustrator, Quark in TIFF or EPS format) of the Album; (iii) label copy and liner notes and all publishing credits (on disk); (iv) true copies of each mechanical license application for use of

k0751034.kt4

This agreement sets forth the entire agreement between you and us with respect to the subject matter hereof. This agreement shall not become effective until it is executed by all parties. No modification, amendment, waiver, termination or discharge of this agreement or any provision hereof shall be binding upon either party hereto unless confirmed by a written instrument signed by a duly authorized officer of you and us. A waiver by either party hereto of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of that provision or any other provisions of this agreement, unless such construction would be unreasonable.

This agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same. The captions used in this agreement are for convenience only, and are not inclusive or exclusive of all matters relating to the captions.

This agreement constitutes the basic terms of our agreement with you and serves to memorialize it and may not be modified or terminated except by a signed written document.

This agreement has binding legal effect, and grants certain exclusive rights to us. You and we acknowledge that you and we have consulted with and are represented by attorneys who are knowledgeable about the subject matter of this agreement and the record and music and entertainment industries, and both parties have been advised about the content and effect of the provisions of this agreement.

If the foregoing correctly reflects our understanding and agreement with you, please so indicate by signing below.

Very truly yours,

KOCH ENTERTAINMENT LLC

By: _____
Authorized Signatory

AGREED & ACCEPTED:
DEATH ROW RECORDINGS, LLC

By: _____

Soc Sec # or Fed Id.: 95-4424194

k0751034.kt4

10

Schedule "A"

## INITIAL ALBUMS

<u>Death Row Catalog</u>

THE CRONIC - DR. DRE

DOGGYSTYLE - SNOOP DOGGY DOGG

ALL EYEZ ON ME - 2PAC

THE 7 DAY THEORY - MAKAVELI

THA DOGGFATHER - SNOOP DOGGY DOGG

MURDER WAS THE CASE - SOUNDTRACK

DEATH ROW GREATEST HITS - VARIOUS

TOO GANGSTA FOR RADIO - VARIOUS

DEAD MAN WALKIN - SNOOP DOG

DOGG FOOD - THE DOGG POUND

ABOVE THE RIM - SOUNDTRACK

GRIDLOCK'D - SOUNDTRACK

GANG RELATED - SOUNDTRACK

RETALIATION, REVENCE & GET BACK - DAZ DILLINGER

HUNG JURY - MICHEL'LE

NECESSARY ROUGHNESS - THE LADY OF RAGE

CHRISTMAS ON DEATH ROW - VARIOUS

CHRONIC 2000 - VARIOUS

k0751034.kt4

11

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") is made and entered into as of July 25, 2003 by and between Afeni Shakur and Amaru Entertainment, Inc., each c/o LaPolt Law, P.C. 9000 Sunset Blvd., Suite 800 West Hollywood, CA 90069 Attn: Dina LaPolt, Esq. (collectively "Amaru") and Koch Entertainment LLC located at 22 Harbor Park Drive, Port Washington, NY 11050 ("Koch") and Death Row Recordings, LLC, Tha Row LLC, f/k/a Death Row Records, Inc., and Death Row Records, Inc. located at 8200 Wilshire Boulevard, Beverly Hills, CA 90211 (collectively, "Death Row").

## RECITALS

REDACTED

Exhibit D

1.    **RIGHTS GRANTED:**

   a.    Notwithstanding the 1997 Death Row Agreement and without limitation of any other rights and conditions thereof and subject to the limitations herein and further approvals as required by Amaru hereunder, Amaru hereby consents to the Death Row-Koch Distribution Agreement and grants for the term of the Death Row-Koch Distribution Agreement, as such term has and may be amended the exclusive worldwide right to manufacture, sell, reproduce, adapt, distribute, transmit, communicate and otherwise use the Eyez LP and the Makaveli LP, the Masters, and the Compilation LPs and, subject to 1(c), any other recordings (the"Other Recordings") by Tupac Shakur that Death Row owns or licenses now or in the future only (collectively, the "Materials"), in any form and by any method or device now or hereafter known, including, without limitation, via cable, any transmission, distribution, dissemination or making available of recordings (or the digitized content thereof) by any means now or hereafter known

LaPoltLawFiles/Clients/Amaru Entertainment,Inc./Litigation/Koch License and Settlement Agr 11FINAL
07-25-03

2

including but not limited to distribution via telephone, satellite, broadcast, wireless, cable and/or the internet (by any method or means or device) whether or not a direct or indirect charge is made (but excluding the manufacture, distribution and sale of physical carriers (hereinafter referred to as "DEMD"), and advertise phonograph records or other reproductions (visual and non-visual) embodying master recordings contained thereon, to lease, license, convey or otherwise use or dispose of the Materials, and by any method now or hereafter known, in any field of use, to release phonograph records or other reproductions embodying same under any trademarks, tradenames, or labels, to perform such phonograph records or other reproductions publicly, and to permit the public performance thereof by means of radio or television broadcast, cable , satellite, internet, wireless, electronic or other transmission, or any other method or device now or hereafter known including but not limited to DEMD, all upon such terms and conditions as Koch may approve, and to permit any other person, firm, or corporation to do any or all of the foregoing or may refrain from doing any and all of the foregoing.   It is agreed that Koch's rights hereunder and pursuant to the Death Row-Koch Distribution Agreement and letter agreement of February 25, 2003 are granted for a 10 year term (i.e., ending on December 31, 2016 ("Term"), Koch having an option to extend for an additional Term, by written notice to the parties hereof.

b.      Solely with respect to Koch's distribution of the Materials, and any other Amaru pre-approved use of the Materials as specifically provided for in Paragraph 2 below, Koch shall have the non-exclusive right to use and publish and to permit others to use and publish Shakur's name and likeness and the trademarks that identified Tupac, including but not limited to "2Pac", "Tupac" and "Tupac Shakur" in connection with the sale and exploitation of the Materials as set forth in this Agreement only. Notwithstanding anything contained herein to the contrary, Amaru makes no representations or warranties in connection with any of the photographs and/or artwork contained on the Eyez LP and the Makeveli LP or otherwise obtained by Koch in connection therewith.

c.      In the instance of any Other Recordings, Koch, Death Row and Amaru agree that such Other Recordings are subject to the 1997 Death Row Agreement, it being understood that Amaru approves Koch as Death Row's distributor for such Other Recordings and that Koch will not distribute Other Recordings without the written approval of Amaru.

REDACTED

i..    Nothing herein contained shall constitute a partnership or a joint venture between or among any of the parties hereto.  No party hereof shall hold itself out contrary to the terms of this subparagraph and no party shall become liable for any representation, act, or omission of the contrary to the provisions hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

AFENI SHAKUR

ACCEPTED AND AGREED as of the date first set forth above.

AMARU ENTERTAINMENT, INC.

By: _____

Its: _____

ACCEPTED AND AGREED as of the date first set forth above.

KOCH ENTERTAINMENT LLC

By: _____

Its:  CEO _____

DEATH ROW RECORDINGS LLC a/k/a
DEATH ROW RECORDS or THA ROW RECORDS

By: _____

Its: _____

LaPoltLawFiles/Clients/Amaru Entertainment,Inc./Litigation/Koch License and Settlement Agr 11FINAL
07-25-03

18

## EXHIBIT A
## LIST OF MASTER RECORDINGS

### ALL EYEZ ON ME

| | |
|---|---|
| Ambitionz Az a Ridah | Can't C Me |
| All Bout U | Shorty Wanna Be a Thug |
| Skandalouz | Holla At Me |
| Got My Mind Made Up | Wonda Why They Call U Bitch |
| How Do U Want It | When We Ride |
| 2 of Amerikaz Most Wanted | Thug Passion |
| No More Pain | Picture Me Rollin' |
| Heartz Of Men | Check Out Time |
| Life Goes On | Ratha Be Ya Nigga |
| Only God Can Judge Me | All Eyez On Me |
| Tradin War Stories | Run Tha Streetz |
| California Love (RMX) | Ain't Hard 2 Find |
| I Ain't Mad At Cha | Heaven Ain't Hard 2 Find |
| What'z Ya Phone # | |

### MAKAVELI:  THE 7 DAY THEORY

| | |
|---|---|
| Intro | Just Like Daddy |
| Bomb First (my second reply) | Krazy |
| Hail Mary | White Manz World |
| Toss It Up | Me and My Girlfriend |
| To Live & Die in L.A. | Hold Ya Head |
| Blasphemy | Against All Odds |
| Life of An Outlaw | |

## EXHIBIT B

## COMPILATIONS LPS

*1.*    **CHRONIC 2000**

Masters

Who Do You Believe In
Late Nite

2.    **TOO GANGSTA FOR RADIO**

Masters

Thugz Nature
Friends

3.    **DEATH ROW'S GREATEST HITS**

Masters

Keep Ya Head Up
Dear Mama
Me Against The World
I Get Around
Hit em Up
Pour Out A Little Liquor
Smile For Me Now

4.    **GANG RELATED**

Masters

Life's So Hard
Starin' Through My Window
Made Niggaz
Lost Souls

5.    **ABOVE THE RIM**

Pour Out A Little Liquor

6.    **GRIDLOCK'D**

Life is a Traffic Jam
Never Had A Friend Like Me
Wanted: Dead or Alive
Out on the Moon
(Boom Boom Boom)

22 Harbor Park Drive, Port Washington, New York 11,050

March 14, 2006

Dimples Merchandising, Inc.
c/o Stabler & Associates, Inc.
15250 Ventura Blvd, Suite 720
Sherman Oaks, CA 91403

Gentlepersons:

When signed by the parties hereto, this letter agreement will constitute the agreement between Dimples Merchandising Inc. ("Dimples") and KOCH Entertainment LP ("Koch") with respect to the following:

1. Koch will have exclusive DEMD Rights (as defined below) throughout North America (the "Territory") for any and all of Dimples' Death Row master recordings that have been delivered, or that will be delivered in the future (the "Death Row Masters"), until April 30, 2011 (the "Term"). "DEMD Rights" is defined herein as any transmission, distribution, dissemination or making available of the Death Row Masters (or the digitized content thereof) by any means now or hereafter known, including, but not limited to, distribution via telephone (including, without limitation, ring tones, ring backs, realtones, pictones and voicetones), satellite, broadcast, wireless, cable and/or the Internet, by any method, device or means.

2. In consideration of the rights granted to Koch hereunder, Koch agrees to pay to Dimples an Advance in the amount of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (the "DEMD Advance"), payable ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (▓▓▓▓▓▓▓▓) upon the execution hereof and the simultaneous execution by Death Row Records of the agreement of even date herewith with Koch pertaining to the DEMD Rights, and the balance no later than Friday, April 7, 2006. Dimples herewith directs Koch to pay ▓▓▓▓▓▓▓▓▓ directly to Gary Greenberg, Esq. for legal services rendered in connection with this agreement, which sum will be deducted from the back-end of the DEMD Advance. The DEMD Advance will be recoupable against Dimples' share of the Digital Net Income (as defined below). Upon Koch's payment of the DEMD Advance to Dimples, the Dimples Digital Agreements will be deemed to have been assigned to Koch (but not Dimples' liabilities thereunder).

3. The "Digital Net Income", defined for the purposes hereunder as the DEMD net proceeds actually received by Koch after all out-of-pocket costs and expenses relating to any DEMD income, including, but not limited to, marketing and promotional expenses and payments to third parties, will be allocated as follows:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓:

▓▓▓▓▓▓▓▓▓

REDACTED

1

Exhibit E

records to verify the accuracy and completeness of accountings hereunder. Such examinations are to be made at Koch's office during usual business hours and upon thirty (30) days prior written notice. Koch's books relating to activities during any accounting period may only be examined as aforesaid during the six (6) month period following service of the statement for that accounting period.

7. As an accommodation to Dimples, Koch agrees to provide Dimples with copies of any new deals pertaining to the DEMD Rights entered into by Koch during the Term. Koch's failure to provide the foregoing to Dimples will not be deemed to be a material breach of this agreement, although Koch agrees to exercise its reasonable commercial efforts to provide Dimples with copies of such agreements upon the written request of Dimples.

8. All notices from or to the parties hereto will be in writing and will be sent by personal delivery, national courier with proof of delivery or by registered or certified mail, return receipt requested. Notices will be deemed to be given when received, and will be sent to the recipient's respective address as set forth above.

9. The parties agree to keep the terms of this agreement confidential, unless otherwise required by law.

10. This agreement will be governed by New York law, and the parties agree to the exclusive jurisdiction of the U.S. Federal Court for the Southern District of New York, New York, in respect of any litigation arising hereunder.

Sincerely yours,

KOCH ENTERTAINMENT LP
By KOCH Entertainment GP LLC (its General Partner)

By: _____
            Authorized Signatory

AGREED & ACCEPTED:

DIMPLES MERCHANDISING, INC.

By _____
      Authorized Signatory

_____
Tavinia Hawkins, individually

3

**HUDSON ENTERTAINMENT INC.**
**411 BOREL AVENUE, SUITE 235**
**SAN MATEO, CALIFORNIA 94402**

June 21, 2006

Koch Entertainment LP
740 Broadway, 7th floor
New York, NY 10003

      Re:    Master Ringtone License

Ladies/Gentlemen:

      Koch Entertainment LP ("Licensor") owns or administers and has the right to license and distribute the sound recording(s) listed on Exhibit A (attached hereto and incorporated by reference) ("Sound Recording(s)"). Hudson Entertainment, Inc. ("Licensee"), a provider of wireless ringtones, ringbacks, and content for other wireless uses, would like to provide the Sound Recording(s) as downloadable master ringtones, ringbacks, and for other wireless uses. As new Sound Recording(s) become available to Licensor, which shall be deemed to be Sound Recording(s) under this License, Licensor shall make such Sound Recording(s) available to Licensee within reasonable proximity of the time of the commercial release of such Sound Recording(s). Licensor agrees to make the Sound Recording(s) available to Licensee under the terms provided below.

1. <u>Grant of Rights:</u>      The exclusive (except as provided in Section 5), limited sub-licensable (i.e., to Licensee's carrier partners) assignable, (as qualified in Section 15), irrevocable (for the full Term other than as a result of Licensee's uncured breach of the terms of this License as provided in Section 13) right and license under all patent rights, copyrights, trademarks, trade names, service marks, trade secret rights, contract rights, moral rights, rights of publicity and privacy, and all other intellectual property rights of any sort other than any rights of the publishers of the music as embodied on the Sound Recordings(s) ("Proprietary Rights") for the Term described in Section 5, at Licensee's expense: (a) to re-create, reformat, and/or sell the Sound Recording(s) as master ringtones, ringbacks, and other wireless uses in MIDI, WAV, ADPCM, MP3, or similar downloadable and transmittable digital data formats, and with approved moving or still images of performer-related artwork, pictures, lyrics, or general information (for example, tour dates, fan club information, and the like); (b) to reproduce the Sound Recording(s) onto Licensee's computer server(s) solely for its internal business purposes and/or for subsequent distribution as master ringtones, ringbacks, and for other

Exhibit F

wireless uses as permitted hereunder to Licensee's sublicensee(s), mobile service providers and carriers, and consumer end-users; (c) to distribute, deliver, upload, download or otherwise transmit as permitted hereunder, and to permit sublicensee(s) and mobile service providers and carriers to distribute, deliver, upload, download or otherwise transmit, the Sound Recording(s) as master ringtones, ringbacks, and for other wireless uses over the Internet (or any successor global computer network) or over a regional wireless transmission network (e.g., BREW, SMS or WAP) for transfer onto consumer end users' individual telecommunications devices; (d) to promote and advertise the availability of the Sound Recording(s) as master ringtones, ringbacks, and for other wireless uses and the related performers/artists using the above-mentioned approved moving or still images of performer-related artwork, pictures, lyrics, or general information, including on the web site from which the Sound Recording(s) will be made available for delivery to end-users; (e) to publicly perform the Sound Recording(s) using streaming technology in an interactive and non-interactive manner for preview by consumer end-users to consider purchasing as master ringtones, ringbacks, and for other wireless uses; and (f) to reproduce, print, publish or disseminate in any medium Licensor's and/or artists'/performers' name, trade names, trademarks, approved likeness and approved biographical material concerning Licensor and/or artists/performers, for the purposes of trade or for advertising purposes solely in connection with the sale and exploitation of master ringtones, ringbacks, and for other wireless uses of the Sound Recording(s) as contemplated under this License.

2. Advance/Royalty:

(a)     Advance. In consideration for all of the rights granted by Licensor to Licensee under this License as a recoupable advance against the royalties ("Royalties") payable to Licensor under this License during the Term, Licensee agrees to pay Licensor ▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ("Advance"). The Advance will be paid one-half (1/2) promptly after the signing of this License by both parties and one-half (1/2) on the date of the first availability of Sound Recording(s), currently scheduled for August 18, 2006. Payment of the Advance also is conditioned on the clearances being obtained by Licensee from the publishers for the Term of exclusivity authorizing the use of the music as embodied on the Sound Recording(s) as part of the download of the ringtones, ringbacks, and other wireless uses of the Sound Recording(s) authorized under the "Grant of Rights", but Licensee represents that it is and will continue to diligently pursue such music clearances in advance of its launch of downloads of the Sound Recording(s) for the uses permitted in the "Grant of Rights". In the event Licensee does not obtain as much as eighty

3. <u>Length</u>:

No use by Licensee of any Sound Recording hereunder shall exceed forty-five (45) seconds.

4. <u>Territory</u>:

North America, namely the United States, Canada, and Mexico ("Territory").

5. <u>Term</u>:

A period of two (2) years, with the first year being an exclusive License to Licensee for the "Grant of Rights", and the second year being non-exclusive License to Licensee ("Term"), and with the commencement of the Term to be measured and applied on a per carrier basis from the sooner of: (a) sixty (60) days from the time Licensor has confirmed to Licensee that Licensee has the authority to launch the Sound Recording(s) as master ringtones, ringbacks, and other wireless uses, which date presently is scheduled for August 18, 2006; or (b) the date each carrier first launches the Sound Recording(s) as available for downloading as ringtones, ringbacks, and other wireless uses as authorized by this License. Any renewals beyond the Term shall be on the mutual written agreement of Licensor and Licensee at their discretion. Except for uncured material breach as provided in Section 13, Licensor will not terminate this License in the event the Advance is not fully recouped, and provided further that if the Advance is not recouped by the end of the Term, then the Term shall be extended until such time as the Advance has recouped.

6. <u>Security</u>:

Licensee shall use commercially reasonable efforts to provide that the Recordings are handled and maintained in a secure fashion in accordance with prevailing industry standards from time to time in place, and using commercially available security and encryption technology from time to time available, and to prevent the creation of any unauthorized copies of any Sound Recording, including, without limitation, copies created by Licensee's employees or contractors outside the immediate scope of their employment. If Licensee becomes aware of any unauthorized manufacture, distribution, lease or sale by any third party of the Sound Recording(s), Licensee shall immediately notify Licensor thereof and shall take commercially reasonable measures to remedy such unauthorized copying or to cooperate with Licensor in the event that Licensor commences any action or proceeding against such third party.

7. <u>Promotional Opportunities</u>:

Licensee shall work with Licensor to provide opportunities at periodic intervals to feature an artist and the Sound Recording(s) of Licensor as part of Licensee's Source Mobile or Source Master marketing and branding initiatives, and to market and promote the availability of the Sound Recording(s) as master ringtones, ringbacks, and other wireless uses, as provided in Exhibit B to this License in partial consideration

assignable or transferable by either party without the prior written consent of the other party; provided, however, that either party hereto may assign its rights to any parent or subsidiary, or to any entity that acquires substantially all of the stock or assets of such party and assumes all obligations and rights of such party under this Agreement.

Within a reasonable time after the date hereof, the referenced parties may enter into more formal agreement to be negotiated in good faith, embodying the terms contained herein together with such additional terms that are usual and customary in accordance with Licensee's customary policies, provided that this License is and shall remain a fully-binding agreement of the referenced parties and shall remain in full force and effect even if a more formal agreement is not executed.

If the foregoing accurately reflects the understanding between you and us with respect to the matters herein, please indicate your acceptance by signing where indicated.

Sincerely,                                    ACCEPTED AND AGREED TO:

LICENSEE:                                     LICENSOR:
HUDSON ENTERTAINMENT, INC.                    KOCH ENTERTAINMENT LP

By: _____                By: _____
    John Greiner                                 Koch Entertainment GP, LLC
                                                 Its General Partner

Title: President                             Name: Robert Frank

Date: 6/26/06                                Title: President

                                             Date: _____